PREGERSON, Circuit Judge,
dissenting:
I respectfully dissent. Bell Atlantic Corp. v. Twombly requires plaintiffs in an antitrust action to plead “enough factual matter (taken as true) to suggest that an agreement was made.” 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (emphasis added). In the “hub-and-spoke” conspiracy alleged here, plaintiffs pleaded enough factual matter (taken as true) to suggest that a horizontal agreement existed between defendants Fender Musical Instruments Corp.; Gibson Guitar Corp.; Hoshino U.S.A., Inc.; Kaman Music Corp.; and Yamaha Corporation of America (“manufacturer defendants”).
Plaintiffs point to six different “plus factors” to support their claim of an agreement among the manufacturer defendants: (1) the manufacturer defendants- shared a common motive to conspire; (2) the manufacturer defendants acted against then-own individual self-interest; (3) the manufacturer defendants adopted substantially similar Minimum Advertised Price (“MAP”) policies; (4) the Federal Trade Commission (“FTC”) investigation of the National Association of Music Merchants, Inc. (“NAMM”) for price fixing; (5) the manufacturer defendants participated in NAMM functions; and (6) the retail prices for guitars and guitar amplifiers climbed despite falling demand.
“[W]hen allegations of parallel conduct are set out in order to make a [Sherman Act] § 1 claim, they must be placed in a context that raises, a suggestion of a preceding argument.” Twombly, 550 U.S. at 557, 127 S.Ct. 1955. Although the majority opinion purports to address the six plus factors as a whole, it actually focuses on each factor individually. Maj. Op. 1194— 98. After dissecting each factor individually, the majority opinion summarily concludes that, though the plaintiffs “provided a context for the manufacturers’ adoption of MAP policies,” that context does not “plausibly [suggest that the manufacturer defendants] entered into illegal horizontal agreements.” Maj. Op. 1198.
When truly analyzed together, the six plus factors strongly suggest that the manufacturer defendants reached an illegal horizontal agreement, which “nudge” plaintiffs’ allegations “from conceivable to *1199 plausible.” Twombly, 550 U.S. at 570, 127 S.Ct. 1955.
First, although a common motive to conspire does not by itself suggest an agreement, this motive combined with the other plus factors suggests the manufacturer defendants made an illegal agreement.
Second, the manufacturer defendants adopted policies such as limiting online advertisement of prices and discounts, all while increasing prices and conditioning dealer authorizations upon strict compliance with the MAP terms. These policies increased prices even though demand for their products decreased, which went against each company’s individual self-interest. Although this factor alone may be insufficient to plead a violation, when viewed together with the other plus factors, this suggests an agreement was made between the manufacturer defendants.
Third, the manufacturer defendants adopted substantially similar MAP policies. The majority opinion correctly notes that the manufacturer defendants adopted MAP policies over the course of several years, but the majority opinion fails to appreciate that the manufacturer defendants adopted substantially similar MAP policies over the course of this relatively short — three-year—period. Both the district court and the majority opinion fault plaintiffs for being unable to show agreement between the manufacturer defendants by pinpointing the exact terms of the MAP policies and the exact timing of their adoption. Because plaintiffs have not been afforded an opportunity to discover these confidential and proprietary policies, it is unfair to require this level of specificity at the pleading stage.[1] While the specific terms and exact timing of the MAP policies may be an issue at the summary judgment stage, a plaintiff at the pleading stage is not required to “allege ‘specific facts’ beyond those necessary to state his claim and the grounds showing entitlement to relief.” Id.
Fourth, the FTC investigation and settlement regarding alleged price fixing in the music-products industry, specifically at NAMM-sponsored events, during the time period at issue here, tends to suggest that an illegal agreement was made between the manufacturer defendants. The FTC complaint stated that “[t]he exchange of information between NAMM members [including the manufacturer defendants], as alleged herein, had the purpose, tendency, and capacity to facilitate collusion and to restrain competition unreasonably.” In the Matter of National Association of Music Merchants, Inc., No. C-4255, at ¶ 7. Although the FTC investigation and settlement concerned violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which does not require allegations of an illegal agreement, the FTC investigation and settlement make it more plausible that there was an illegal agreement between the manufacturer defendants. In general, mere involvement with a trade organization does not necessarily suggest the existence of illegal activity; however, allegations by the FTC that a certain trade association’s meetings “had the purpose, tendency, and capacity to facilitate collusion” makes it more plausible — especially when considering all six plus factors — that an illegal agreement was made.
Fifth, representatives of the manufacturer defendants attended NAMM-sponsored events where they discussed and promoted specific MAP pricing structures. In In Re Text Messaging Antitrust Litigation, 680 F.3d 622, 628 (7th Cir.2010), the *1200 Seventh Circuit held that the defendants— four United States telecommunications companies accounting for 90% of the text messaging services in the United States— participated in trade association meetings where specific pricing structures were discussed, which, among other allegations, suggested collusion. Similarly here, discussions at NAMM-sponsored events of specific mutually agreeable terms are a “circumstance pointing toward a meeting of the mmds[.]” Twombly, 550 U.S. at 557,127 S.Ct. 1955.
Sixth — and perhaps most suggestive of collusion — despite falling demand for guitars and guitar amplifiers, the average retail price of these items increased substantially from 2005 to 2007. In 2006, for example, the number of electric and acoustic guitars sold decreased 9.62% from the year before. Yet, despite the decline in demand, the average retail price for each unit rose 6.13% from the year before. Similarly, despite a decline of 12% in the number of amplifier units sold in 2006 from the previous year, the average retail price of each unit increased 3.13%. The majority opinion attributes these statistics to “[a]ny manner of economic variables.” Maj. Op. at 1197 n. 13. Nevertheless, the allegations that prices rose despite falling demand demonstrates that it is plausible that something outside normal market conditions was at work: in this case, collusion. See In Re Text Messaging, 630. F.3d at 628-29 (finding the allegations that defendant communications companies’ anomalous behavior of rapidly increasing prices despite falling costs, among other things, suggested collusion was plausible).
The majority opinion found that each of these plus factors can be attributed to permissible parallel conduct and that, in “context,” they do not plausibly suggest that an illegal horizontal agreement was made. Maj. Op. at 1198. Yet the standard under Twombly requires that the plaintiffs’ allegations must only raise “plausible grounds to infer an agreement,” which “simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.” 550 U.S. at 556, 127 S.Ct. 1955 (emphasis added). I simply cannot agree with the majority opinion that the plaintiffs’ inference of an agreement is implausible, especially where the litigation is at the motion to dismiss stage, not the summary judgment stage.
Moreover, the majority opinion is based on numerous assumptions of the guitar and guitar amplifier retail market. For example, the majority opinion states that “so long as prices can be easily readjusted without persistent negative consequences, one firm can risk being the first to raise prices, confident that if its price is followed, all firms will benefit. By that process (‘follow the leader’), supracompetitive prices and other anticompetitive practices, once initiated, can spread through a market without any prior agreement.” Maj. Op. at 1194-95. This assumes that (1) retail prices in the guitar and guitar amplifier business can be easily readjusted, (2) competent business firms are willing to place their products at a competitive disadvantage in a highly competitive market, (3) competitive business firms are independently confident that price increases will be followed by competitors, and (4) no agreement (either tacit or express) was ever reached between the manufacturer defendants. These are a lot of assumptions to make without providing plaintiffs the opportunity to conduct full discovery.
Here, plaintiffs’ allegations of parallel conduct raise plausible grounds to infer that an illicit horizontal agreement was made between the manufacturer defendants. Plaintiffs allege six plus factors which, when analyzed together, “nudge[] their [allegations of a horizontal agree *1201 ment] across the line from conceivable to plausible[.]” Twombly, 550 U.S. at 570, 127 S.Ct. 1955. Therefore, I would reverse the district court’s dismissal of plaintiffs’ Sherman Act claim and remand for further proceedings.

. While plaintiffs were allowed limited discovery on the "closed door” meetings at NAMM-sponsored events, they were explicitly barred from inquiring about specific terms of the MAP policies.